USDC SCAN INDEX SHEET

















JAH   6/7/04   10:00

3:04-CV-00209   SHERMAN V. HARBIN

*33*

*ABR.*

LON B. ISAACSON ASSOCIATES
An Affiliation Including A
Professional Law Corporation
Lon B. Isaacson, Esq. (SBN 64838)
Larry D. Johnson, Esq. (SBN 180570)
3435 Wilshire Boulevard, Suite 2910
Los Angeles, California 90010-2015
Telephone Number:  (213) 487-7200
Fax Number:        (213) 383-2884
After Hours:       (310) 486-0890

Attorneys for Appellant Jeffrey Sherman

**FILED**

JUN - 3 2004

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY_____ DEPUTY

# UNITED STATES DISTRTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

|   |   |
|---|---|
| In Re:<br><br>JOHN ALAN HARBIN,<br><br><br><br><br><br><br><br><br><br>                    Debtor | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Dist. Ct. Case No: 04CV209 BTM
 (WMC)
  Bankruptcy Case No:  02-03303 JH

Appeal from United States Bankruptcy Court
For the Southern District of California
Honorable John Hargrove
 Bankruptcy Judge, Presiding

APPELLANT'S OPENING BRIEF

DATE:       July 23, 2004
TIME:       11:00 a.m.
PLACE:      Courtroom 15

i

33

APPELLANT'S OPENING BRIEF

## TABLE OF CONTENTS

STATEMENT OF APPELLATE JURISDICTION .................................................................1

STATEMENT OF ISSUES ON APPEAL................................................................................1

STATEMENT OF THE CASE..................................................................................................2

STATEMENT OF FACTS .......................................................................................................4

    A. BACKGROUND INFORMATION.................................................................................5

    B.  HARBIN'S WIFE REFINANCES THE PROPERTY WITH HIS SUPPORT, BUT
    WITHOUT OBTAINING PRIOR BANKRUPTCY COURT APPROVAL ........................8

    C.  THE COURT CONFIRMED A CHAPTER 11 PLAN OVER JEFFREY SHERMAN'S
    OBJECTION THAT THE PLAN DID NOT PROVIDE FOR THE POSSIBILITY THAT
    SHERMAN WOULD PREVAIL IN HIS STATE COURT APPEAL.  THE FAILURE TO
    PROVIDE FOR SHERMAN'S POSSIBLE JUDGMENT IN THE STATE COURT
    LITIGATION RENDERED THE PLAN INFEASIBLE. ....................................................18

SUMMARY OF ARGUMENT ................................................................................................29

    A. THE BANKRUPTCY COURT ERRED IN CONFIRMING HARBIN'S SECOND
    AMENDED CHAPTER 11 PLAN.....................................................................................29

    B. THE BANKRUPTCY COURT ERRED WHEN IT GRANTED THE TWO MOTIONS
    FOR NUNC PRO TUNC APPROVAL OF THE REFINANCE .............................................31

ARGUMENT .............................................................................................................................31

    A. THE BANKRUPTCY COURT COMMITTED REVERSIBLE ERROR IN CONFIRMING
    THE CHAPTER 11 PLAN WHEN IT DID NOT PROVIDE FOR THE POSSIBLITY THAT
    SHERMAN WOULD PREVAIL IN HIS STATE COURT LITIGATION AND DID NOT
    PROVIDE SHERMAN WITH EQUAL TREATMENT WITH OTHER CREDITORS IF HIS
    CLAIM WAS REINSTATED ............................................................................................31

    B............. THE COURT ERRED IN GRANTING THE MOTIONS FOR NUNC PRO TUNC
    APPROVAL BECAUSE THE ORDER PREJUDICED SHERMAN .....................................41

CONCLUSION.........................................................................................................................44

BRIEF FORMAT CERTIFICATION PURSAUNT TO RULE 32(A)(7) OF THE FEDERAL
RULES OF APPELLATE PROCEDURE................................................................................45

ii

--

TABLE OF AUTHORITIES

**Cases**

Bank of W. Mass. v. CPF Premium Funding (In re National Reserve Corporation), (BC D MA 1996), 199 B.R. 241 ...................................................................................................42, 43

Bezanson v. Indian Head National Bank et al., ("In Re J.L. Graphics, Inc."), (1st Cir. 1987) 62 B.R. 750 Bankr. D. N.H. 1968, affirmed 818 F.2d 1027........................................................14

Farinash v. Vergos (In re Aultman Enters.), (2001) 264 B.R. 485 ..............................................43

In Re Abijoe Realty Corp., (1st Cir. 1991) 943 F.2d 121............................................................40

In re Allustiarte, (9th Cir. 1988) 848 F.2d 116 ............................................................................1

In Re American Cooler Co., (2nd Cir. 1942) 125 F.2d 496.......................................15, 16, 41, 42

In Re Amatex Court, (3rd Cir. 1985) 755 F.2d 1034....................................................................32

In Re Atkins,  (9th Cir. 1995) 69 F.3d 970 ...................................................................1, 41, 43

In Re Blessing Industries, Inc., (BC ND IA 2001) 263 B.R. 268..................................................43

In Re Cobe, (9th Cir. BAP    ) 229 B.R. 15. ...............................................................................24

In Re Dennis Ponte, (9th Cir. BAP 1986) 61 B.R. 296 .....................26, 29, 31, 32, 33, 34, 37, 38

In Re Kreisler Group, (2nd Cir. 1981) 648 F.2d 86.....................................................................40

In Re Lehigh Valley Professional Sports Club, Inc., (BC ED PA 2001) 260 B.R. 745 ........16, 41

In Re Pizza of Hawaii, (9th Cir. 1985) 761 F.2d 1374 .................................................................
.................................................................1, 26, 28, 30, 31, 32, 34, 35, 36, 37, 38

In Re Rath Packing Company, (BC ND IA 1985) 55 B.R. 528 ...................................................40

In Re Shoen, (1996 BC AZ) 193 BR 302 .....................................................................26, 39, 40

In Re Universal Life Church, (ED CA 1991) 127 B.R. 453 .......................................................38

Oxford Life Ins. Co. v. Tucson Self-Storage (In re Tucson Self-Storage), (9th Cir. BAP 1994) 166 B.R. 892 ........................................................................................................38, 39

iii

--

**Statutes**

11 U.S.C. §1141 ........................................................................................................28, 39

11 U.S.C. §364 .............................................................................................................1, 17

11 U.S.C. §503 ..................................................................................................................33

28 U.S.C. §158(a) ...............................................................................................................1

**Other Authorities**

Federal Rule of Bankruptcy 8002(a) .................................................................................1

Federal Rule of Bankruptcy 9024 ....................................................................................39

iv

--

## STATEMENT OF APPELLATE JURISDICTION

The United States District Court has jurisdiction over this appeal from final orders of the United States Bankruptcy court pursuant to 28 U.S.C. §158(a).  This appeal is timely, having been filed on December 23, 2003, within 10 days of the entry of the court's orders on December 24, 2003 (Order Confirming Debtor's Revised Second Amended Plan of Reorganization) and on January 6, 2004 (Order On Motion for Nunc Pro Tunc Approval of Post petition Financing Under 11 U.S.C. §364 and for related relief).  See, Federal Rule of Bankruptcy 8002(a) and In re Allustiarte, (9th Cir. 1988) 848 F.2d 116, 117.  ("A notice of appeal is deemed timely if filed prior to entry of the order on the docket sheet.").  An order confirming a Chapter 11 plan is a final order subject to immediate appeal.  In Re Pizza of Hawaii, (9th Cir. 1985) 761 F.2d 1374, 1378.  Similarly an order granting a motion for nunc pro tunc approval is a final order.  See, e.g. In Re Atkins, (9th Cir. 1995) 69 F.3d 970, 973.

## STATEMENT OF ISSUES ON APPEAL

1) Whether the debtor's Second Amended Plan was infeasible when it committed to pay 100% of the unsecured creditors' claims, but failed to include a mechanism to provide Jeffrey Sherman with 100% of his claim if he ended up with a judgment from ongoing state litigation against the debtor?

2) Whether the Bankruptcy Court materially erred in confirming the Second Amended Plan that excluded Jeffrey Sherman without holding in its order that Jeffrey Sherman's debt was not discharged?

3) Whether the United States Bankruptcy Court for the Southern District of California

1
--

materially erred in granting the debtor's and IndyMac's simultaneous Motions for

Nunc Pro Tunc approval of post-petition refinancing that removed more than $54,000

from the equity in Harbin's house to Sherman's detriment and prejudice when the

court ruled Sherman would look to the equity if he prevailed in his California

litigation?

## STATEMENT OF THE CASE

John Harbin ("Harbin") filed a Chapter 7 bankruptcy petition on April 3, 2002 because a Los

Angeles Superior Court Jury had issued a verdict holding him liable for $414,003.87 for breach

of contract and breach of the covenant of good faith and fair dealing related to his purchase of a

law firm from Jeffrey Sherman ("Sherman").  Before the court ruled on Harbin's cross-

complaint, Sherman applied for a writ of attachment to prevent Harbin from transferring assets.

Believing that the Los Angeles Superior Court would issue the attachment and would then later

enter a judgment based upon the jury's verdict, Harbin filed bankruptcy.  The Los Angeles

Superior Court then improperly ruled that Harbin was not personally liable under the contract

and ruled that the jury was only advisory.  The court's actions were improper because the court

had previously ruled that the contract was ambiguous.  To resolve the ambiguity, the court had

admitted extensive extrinsic evidence for the jury to resolve.  Further, the court improperly

concluded that Harbin's declaratory relief action was equitable in nature.  The declaratory relief

action did not involve any equitable issues at all, but instead asked the court to declare a factual

assertion, namely that Harbin was not liable under the contract.

After the Los Angeles Superior Court issued its ruling exonerating Harbin from his liability

under the jury verdict, Harbin sought to dismiss his Chapter 7 case.  However, by that time it had

2

--

come to light that Harbin's residence was worth at least $300,000 more than he declared in his

chapter 7 schedules.  The court denied Harbin's motion to dismiss because the creditors and the

Chapter 7 Trustee opposed the motion.  Harbin then converted his case to Chapter 11 to prevent

the Chapter 7 Trustee from selling his home.

Meanwhile, the court granted relief from the automatic stay to Sherman so that he could

continue litigating his state court action against Harbin.  The only avenue remaining to Sherman

was to appeal the trial court's improper and erroneous order.  The Bankruptcy Court

acknowledged on the record that Sherman's claim would not be finally resolved until the

California appellate courts issued their final rulings.  Meanwhile, the court granted summary

judgment motions on Sherman's adversary complaint to bar discharge, stating that its orders

were conditioned on the final result of the state court appeals.  The court issued a similar order

conditionally disallowing Sherman's proof of claim.  The court stated in three separate hearings,

one after the court supposedly "disallowed" Sherman's claim, that Sherman's claim was

contingent.

Harbin sought to sell his interest in his house to his wife for less than the fair market value.

Mrs. Harbin sought a loan in anticipation of that motion being granted.  The court refused to

grant the motion because it was evident that the property was worth far more than Mrs. Harbin

offered to pay and because Harbin had not marketed the property.  The court continued the

hearing to March 5, 2003 for a status conference in preparation for an evidentiary hearing on the

motion. However, on February 14, 2003 Harbin executed a quitclaim deed transferring his

interest in the real estate to his wife, who then refinanced the property with the loan she had

applied for in anticipation of purchasing the property.  Mrs. Harbin then issued a quitclaim back

3

--

to Harbin.  Harbin then filed a motion asking the court to approve his wife's refinance <u>nunc pro</u> <u>tunc</u>.  Harbin withheld information about the refinance, causing the court to continue the hearing multiple times and to require multiple declarations from Harbin, and ultimately from Mrs. Harbin, before the truth came out.  The refinance resulted in Harbin taking out more than $53,896 from the equity, which the court ordered Harbin to deposit into a Debtor-in-Possession Account.

Harbin then filed a proposed Second Amended Plan that proposed to pay "undisputed" creditors 100% of their claims.  The plan did not make any provision for the possibility that Sherman would prevail in his state court appeal and would have a substantial judgment against Harbin.  The plan also provided that any debt that was potentially in existence pre-petition was discharged.  Sherman objected to the Second Amended Plan contending that 9th Circuit case law held that a party who has a potential claim based upon ongoing litigation must be provided for in the plan.  The plan must withhold a pro rata share for Sherman in case he prevailed in his state court appeal.  Over Sherman's objection, the court confirmed the Second Amended Plan.

By the time of the confirmation hearing IndyMac had joined in Harbin's motion for <u>nunc pro</u> <u>tunc</u> approval of the refinance and filed its own Motion for <u>Nunc Pro Tunc</u> approval.  The court not only granted that motion, but also confirmed Harbin's plan contending the plan did not affect Sherman because Sherman's claim had been disallowed.  Sherman contends that this prejudiced him as it deprives him of the opportunity to receive an equal distribution with other creditors, unfairly discharges the debt owed to him, and removes the money from the equity he would be required to use to satisfy a judgment.

## STATEMENT OF FACTS

4

--

## A. BACKGROUND INFORMATION

On or about May 10, 2000 Sherman filed a lawsuit against Harbin for, inter alia, breach of contract and breach of the covenant of good faith and fair dealing related to Sherman's sale of his law practice to John Harbin.  Appellant's Appendix at exhibit 13, bate stamped page 199:12-23 fn1. (The Notice of Filing Motion for Relief from the Automatic Stay).  Harbin asserted a cross-complaint against Sherman for declaratory relief, seeking a ruling that Harbin was not liable for the breach of contract.  Id.  In November 2001, the Los Angeles Superior Court began a five-week jury trial, which ended with a jury ruling that Harbin was personally liable to Sherman for breach of contract in the sum of $414,003.87.  AA:13:199:24-28.  The trial court then took Harbin's cross complaint under submission.  While the court's ruling was pending Sherman filed a motion for a writ of attachment.  AA:13:200:7-10.  Harbin then filed the instant bankruptcy case as a Chapter 7 petition on April 3, 2002 in order to prevent the court from issuing the writ of attachment.  AA:13:200:11-12.  Harbin also contends that he filed the instant bankruptcy because of a state court "'judgment' in favor of Sherman in the amount of $414,000."  AA:18:230:26-28.  After Harbin filed his Chapter 7 petition, the court issued its ruling that Harbin was not personally liable despite the factual finding of a jury that Harbin was personally liable.  AA:13:200:13-17.

Buoyed by the Los Angeles Superior Court's remarkable and erroneous jury-overturning ruling, Harbin sought to dismiss his Chapter 7 case, but the court denied his request on August 6, 2002.  AA:8:83:8-14: AA:7:78-79.

Harbin's Chapter 7 petition contended that he owned a home in the prestigious

---

1 Henceforth, the appellant shall refer to the Appellant's Appendix as AA and shall cite to the exhibit number followed by the bate stamped page number and the line number, if applicable, as

community of Coronado, California that he valued at $825,000. AA:1:4. (Harbin's Bankruptcy Petition). He claimed later in the proceedings that he had based that valuation on an appraisal he obtained in January 2002. AA:11:173:1-4. The Chapter 7 Trustee received an offer from Hilliard Lipman to purchase the property for $1.1 million. AA:8:103:3-6. On August 2, 2002 the court denied a motion to compromise the debtor's claim to equity in the real property listed in his schedules. AA:6:76-77. The Chapter 7 Trustee then filed on August 6, 2002 a motion to approve sales procedures in order to sell the property to Mr. Lipman or to the person or entity who was the highest bidder. AA:3:59-65. On August 9, 2002 Harbin filed a motion to convert his case to Chapter 11. AA:4:66-69. The court entered its order converting the case to Chapter 11 on August 13, 2002. AA:5:74-75.

Sherman filed a motion to reconvert the case to Chapter 7. AA:8:80-156. (Motion to Reconvert). Sherman contended that Harbin had converted his case in bad faith in order to prevent the trustee from selling his residence. AA:8:89:26-90:5. Harbin opposed the motion to reconvert the case by contending that he could propose a Chapter 11 plan. AA:9:159-161. (Harbin's Opposition to Motion to Reconvert). One of Harbin's commitments in his brief in opposition to the motion to reconvert his case to Chapter 7 was that he would file a plan that would "allow undisputed creditors to receive an immediate partial distribution on account of their claims, while reserving an equal pro rata percentage for those claims that are disputed, and for which I will vigorously be seeking disallowance." AA:11:173:13-17. (Declaration of John Harbin in opposition to Motion to Reconvert). He repeated his commitment to propose a plan that would pay the undisputed creditors only a pro rata share by stating "The funding source for the pro rata payment of these claims, should they be allowed, will be the reserved sequestered

follows: AA:13:199:12-23.

6

--

funds that have been created by virtue of my exempt assets as well as any equity available from the proceeds of the sale of my interest in my residence." AA:11:174:10-12.

Sherman filed a motion for relief from stay so that the court would allow a judgment to be entered in the state court litigation. AA:13:189-202. (Motion for Relief from Stay). Harbin opposed that motion on a limited basis. AA:14. (Limited Opposition to Motion for Relief from Stay). He contended that "Sherman has a contingent disputed claim which will become a final judgment." AA:14:204:23-25. The court granted relief from the automatic stay in order to allow the debt to Sherman to become liquidated. AA:17:211-228; AA:17:217. (Order Granting Motion for Relief from Stay).

Harbin attempted to sell his interest in his familial residence to his wife by valuing the property at $1,025,000. Transcript, January 29, 2003 at 4:5-7; AA:20:242:24-25. Harbin attempted to deduct 6% from the value of the house as a commission despite the fact that he and his wife were not using a broker in the proposed transaction. AA:19:242:19-21; Transcript, January 29, 2003 at 4:7-9. Sherman objected to the proposed sale on the grounds that the proposed transaction between Harbin and his wife was not at arms-length and did not follow an attempt to market the property to the public. AA:21:255:12-256:24. Indeed, the proposed sale indicated that Mrs. Harbin, an unemployed woman (See AA:1:18), would take out a loan resulting in $62,000 in cash being taken from the home, but she would somehow be able to deposit into her husband's debtor-in-possession account $109,000. AA:21:256:11-20. Prior to that date Hilliard Lipman had already offered $1,100,000 for the house. AA:21:260:7-12. (Opposition to Motion to Approve Sale of Debtor's Interest in Real Property). Mr. Lipman's real estate agent believed that the property was then worth up to $1,200,000. AA:23:327:2-5.

7

(Declaration of W. Craig Clark).

The Bankruptcy Court did not allow Harbin to sell the property to his wife, but instead ordered it would hold an evidentiary hearing to justify the sale. Transcript, January 29, 2003 at 13:17-14:9 and at 17:19-20 and at 22:23-25. The court also held that the creditors would have to vote on Harbin's plan to sell his interest in his residence to his wife in a Chapter 11 plan. Id. at 14:10-14. During the January 29, 2003 hearing the court reasoned that there was no reason for Harbin to sell his house at that time because "it seems to me (The Court) he can construct a plan which says the debtors stays in the house. If...the disputed claim is allowed (Sherman's claim), then the debtor would sell the house." Id. at 18:10-15. On March 5, 2003 Harbin withdrew his motion to sell the house. Transcript, March 5, 2003 at 10:19-25.

### B. HARBIN'S WIFE REFINANCES THE PROPERTY WITH HIS SUPPORT, BUT WITHOUT OBTAINING PRIOR BANKRUPTCY COURT APPROVAL

Prior to the March 5, 2003 hearing Harbin's wife refinanced his property by taking a new mortgage out for $707,000 without first obtaining court approval. This effectively took $60,000 in equity out of the property, as the mortgage outstanding when Harbin filed his Chapter 7 petition was only $647,699. AA:1:10. After the refinance had been completed, Harbin filed a Motion for Nunc Pro Tunc approval of the refinance. AA:24. Harbin admitted that the refinance had resulted in $53,896.05 being taken out of the equity in the residence. AA:24:331:17-21. (Motion for Nunc Pro Tunc approval of Refinance). This reduced Harbin's monthly payments on the mortgage by $300.00 per month. AA:24:331:22-23. Harbin claimed that he deposited the $53,896.05 into his Debtor-in-Possession account for implementation of the plan and payment of creditors. AA:24:331:24-25. Harbin suggested in a declaration that his

8

wife had alone applied for the refinance loan and that IndyMac simply approved and funded the loan.  AA:24:340:17-18 (Declaration of John Harbin in Support of Motion for <u>Nunc Pro Tunc</u> approval of refinance.).  In a Declaration filed on July 8, 2004, Harbin contended that he would be holding the property "pending resolution of disputed claims."  AA:24:352:25-353:1.

Sherman understood the positions taken by Harbin to indicate that IndyMac had somehow funded the loan without Harbin's participation.  AA:25:630:8-12.  (Opposition to Motion to Approve Refinance).  Sherman opposed the Motion for <u>Nunc Pro Tunc</u> approval of the refinance contending that Harbin had not shown extraordinary circumstances.  AA:25:630.5-8.  Harbin's motion failed to explain why he had not sought prior approval of the court.  See, Opposition to Motion for <u>Nunc Pro Tunc</u> approval of refinance filed by attorney Norman Kreisman at AA:26:644:24-28.  Further, Harbin was ultimately unable to satisfy another requirement that none of the other parties be prejudiced.  AA:26:645:1-3.  (Sherman & Sherman's Opposition to Motion for <u>Nunc Pro Tunc</u> approval of refinance).  In fact, the bankruptcy court ultimately confirmed Harbin's Chapter 11 plan by allowing Harbin to pay 100% of his "undisputed" claims by using the $53,896.05 deposited into the Debtor-in-Possession account to pay those claims.  That $53,896.05 had been placed into a blocked account by order of the court.  AA:28 (Order establishing blocked account); Transcript, May 8, 2003 at 34:19-20; 37:15-19; 40:10-24.  This prejudiced Sherman because Sherman would be unable to recover the $53,896.05 taken out of the equity, which was the sole asset to which Sherman could turn for recovery.

The court held its first hearing on the Motion for <u>Nunc Pro Tunc</u> approval of the refinance on May 8, 2003.  The court's first comment at the hearing was that the motion was

9
--

troublesome. Transcript, May 8, 2003 at 32:21-22. The court noted that Harbin's declaration to explain the transaction failed "miserably in that regard. It's very generalized, almost borders on being evasive." Id. at 33:1-13. The court continued the hearing and ordered Harbin to provide an adequate explanation of why he did not get prior court approval. Id. at 33:17-20. The court ordered Harbin to provide the loan application showing who applied for the loan, the signatures on the loan, the dates, any correspondence, a copy of the appraisal obtained in connection with the refinancing, and the trust deed. Id. at 33:20-34:8. The court pointed out that its impression was that Harbin was saying "'Oh, I just really didn't know about this…'the loan was taken out in my wife's name.' 'I really didn't have anything to do with it, and it just kind of slipped by before I knew.' 'I just forgot about it and I couldn't put…'put the brakes on the refinance because I thought we were going to be able to sell the house.'" Id. at 34:9-14. The court explained that there was not enough evidence before the court to satisfy the first element of the exceptional circumstance test. Id. at 41:1-5. The court warned that if Harbin did not provide a "candid explanation" the court would consider putting in a Chapter 11 trustee. Id. at 41:7-9. The court then continued the hearing to July 15, 2003. Id. at 45:6-47:12.

On July 8, 2003, Harbin filed a supplemental declaration wherein he attached some, but not all, of the documents requested by the court. AA:24:352-625. Harbin's declaration failed to answer various questions that the court had raised. For instance, Harbin attached a loan application dated November 18, 2002 stating that Mrs. Harbin would own the property as a married woman as her sole and separate property. AA:29:665:17-21; AA:24:359. Harbin did not attach any correspondence between himself, his wife, or the lender. AA:29:665:22-666:10. Harbin did not attach a copy of the deed of trust and promissory note. AA:29:666:3-6. Harbin

10
--

did attach a copy of an appraisal valuing the property at $1,200,000 as of December 23, 2002. AA:29:666:4-5; AA:24:489-490. This contradicted Harbin's previous position that the property was only worth $1,025,000 in January 2003. See, Transcript, January 29, 2003 at 4:5-7. In fact, on January 29, 2003 the debtor only agreed to increase the offer by his wife to purchase the property to $1,100,000 despite the existence of an appraisal by his own lender valuing the property at $1,200,000.

Due to Harbin's failure to provide full and complete responses to the court's May 8, 2003 order, Sherman again opposed the Motion for <u>Nunc Pro Tunc</u> approval of the refinance. AA:29. Sherman pointed out that Harbin could not satisfy the required element of the test for obtaining <u>nunc pro tunc</u> approval of the refinance because Harbin could not explain why he could not and did not obtain prior court approval. AA:29:670:6-16. In fact, Harbin had sought prior approval of the very loan his wife obtained when he filed his motion to allow him to sell the property to his wife. The court had refused to grant that relief. AA:29:670:13-16. Sherman further pointed out that Harbin had erroneously contended that the property was worth $1,025,000 after he knew or should have known that his wife's lender had obtained an appraisal valuing the property at $1,200,000. AA:29:670:16-28. Sherman objected that Harbin still had not produced the note and deed of trust his wife executed in February 2003. AA:29:671:18-20. Other creditors, through attorney Norman Kreisman, also objected to the Motion for <u>Nunc Pro Tunc</u> approval of the refinance. AA:30. Those other creditors pointed out that Harbin was trying to "skate-by" by providing as little information as possible about the transaction. AA:30:680:2-5. They further claimed that the refinance was unfair to creditors. AA:30:685:11-16. They found it unbelievable that Harbin had nothing to do with the transaction. AA:30:685:17-21.

11

--

On July 15, 2003, the court held a second hearing on the Motion for <u>Nunc Pro Tunc</u> approval of the refinance.  Harbin's attorney for the first time revealed the astonishing fact that Harbin had executed a quitclaim deed to Angela Harbin prior to the refinance being consummated.  Transcript, July 15, 2003 at 6:9-17 fn2.  Harbin's attorney then represented that Mrs. Harbin had immediately transferred the title back to the estate or "back to John Harbin." <u>Id.</u> at 6:17:25.  The court asked if a title report existed to reflect that fact and once again stated that the court was troubled by the way Harbin had failed to represent the complete facts in his motion.  <u>Id.</u>  The court noted that it had requested the grant deed for the refinance at the last hearing.  <u>Id.</u> at 7:10-12.  The court repeated its concerns from the May 8, 2003 hearing by noting that "And then there's a deed of trust?  Mr. Harbin seemed to indicate that he just didn't know this transaction with a going on [sic].  It just got started and then he changed his mind about a sale and the process kept going, and he didn't know about it.  Mrs. Harbin, apparently, takes care of the whole situation.  And that troubled the court." <u>Id.</u> at 9:5-11

Harbin's counsel tried to explain that Mrs. Harbin applied for the loan in order to purchase the property from Harbin, the motion was withdrawn on or after January 29, 2003, and the refinance loan was completed on February 15, 2003.  <u>Id.</u> at 9:12-10:12.  Harbin's attorney then acknowledged that Harbin knowingly participated in helping his wife get the refinance because the loan had a good interest rate.  <u>Id.</u> at 11:4-13.  The court noted that Harbin's declaration did not provide details about how the transaction had taken place.  <u>Id.</u> at 11:18-22. The court then noted that Harbin and his attorneys had represented to the court that the property could not possibly be worth $1,200,000 after the appraisal had been obtained for the refinance.

---

2 The court reporter undoubtedly misunderstood the term "quitclaim" and repeatedly transcribed "quick claim."  Undoubtedly that is a clerical error by the court reporter and the transcript should

12

--

Id. at 12:19-13:6.  Harbin's attorney claimed that neither he nor Harbin had knowledge of that

appraisal.  Id. at 13:7-12.  The court expressed its disbelief that Harbin did not know of the

$1,200,000 appraisal.  Id. at 15:4-16.  The court then told Harbin's counsel that he was

considering appointing an examiner because the court had to squeeze information out of Harbin.

Id. at 19:12-17.

Sherman continued to object to the Motion for Nunc Pro Tunc approval and asked the

court to appoint a Chapter 11 trustee or that the court convert the case to Chapter 7.  Sherman

argued, and the court agreed, that banks do not loan $707,000 without sending correspondence.

Id. at 23:12-15.  Sherman pointed out that Harbin is an experienced bankruptcy attorney.  Id. at

24:7-9.  The court hesitated to appoint an examiner or impose any other remedy because of the

nature of Sherman's standing to object.  Id. at 25:1-7.  The court agreed that it had been required

to extract information from Harbin on his Motion for Nunc Pro Tunc approval.  Id. at 25:15-21.

Judge Hargrove called Sherman's claim "contingent."  Id. at 26:10-13.  The court later

acknowledged that banks tend to be conservative by obtaining low appraisals.  Id. at 29:21-30:2;

35:10-14.

The debtor's wife, Angela Harbin, filed a declaration on July 25, 2003 in support of the

Motion for Nunc Pro Tunc approval of the refinance.  AA:34.  Mrs. Harbin contended that the

broker she worked with had recommended that Harbin quitclaim title in the property to her and

that she immediately quitclaim the property back.  AA:34:765:13-25.  Harbin also admitted that

he had signed a quitclaim deed without the bankruptcy court's permission.  AA:35:769:8-19.

Harbin further admitted that he did that out of expedience, as he wanted the funds to propose a

Chapter 11 plan.  AA:35:769:20-26.  Harbin's July 25, 2003 declaration revealed more

be read to replace the word "quick" with "quit" on page 6 and thereafter in that transcript.

13

--

violations, misleading comments, and outright perjury on his part. Harbin claimed that he had

not signed any documents to assist in the refinance taking place. AA:37:782:3-16. In fact, he

had signed a "Statement of Information, "Loan Escrow Instructions" and "Amendment to

Escrow Instructions." Id. Sherman argued that Harbin's admission that he had knowingly

signed a quitclaim deed transferring title to his wife without court approval prevented him from

satisfying the requirement that he adequately explain why he did not obtain prior court approval.

AA:37:784:11-26. The U.S. Trustee argued in advance of the August 5, 2003 hearing that

Harbin's execution of the quitclaim deed to his wife while knowing that he did not have the

court's prior approval for that action should disqualify him as a Debtor-in-Possession.

AA:38:791:24-792:7. The U.S. Trustee argued that Harbin had now created a conflict of interest

between his fiduciary duty to the estate and his desire to avoid liability to IndyMac. Id. The

U.S. Trustee agreed with Sherman and other creditors that Harbin's omission of his involvement

in executing the quitclaim deed prior to the refinance taking place was a material

misrepresentation to the court. AA:38:793:1-795:24. The U.S. Trustee cited to Bezanson v.

Indian Head National Bank et al., ("In Re J.L. Graphics, Inc."), (1st Cir. 1987) 62 B.R. 750

Bankr. D. N.H. 1968, affirmed 818 F.2d 1027 for the proposition that retroactive relief should

not be granted when the parties could have made an emergency motion seeking prior approval in

a matter of days. AA:38:796:11-23. The U.S. Trustee argued extensively, and correctly, that

Harbin had failed to meet the requirements for nunc pro tunc approval because he could not meet

the elements. AA:38:797:1-799:20. The U.S. Trustee specifically argued that Harbin could not

establish that the court would have approved the refinance loan because the loan diminished the

equity in the property that would otherwise be available to the creditors. AA:38:798:22-799:10.

14
--

(See especially pages 798:25-799:2).  The U.S. Trustee then pointed out that Harbin and the lender knew that the refinance could not be completed without Bankruptcy Court approval and intentionally circumvented the law.  The trustee argued that by so doing Harbin could not provide an adequate explanation as to why Harbin could not have obtained prior court approval.  AA:38:799:11-15.

The court continued the hearing on the Motion for <u>Nunc Pro Tunc</u> approval from August 5, 2003 (after conducting a hearing) so that it was ultimately heard on December 11, 2003.  After IndyMac received formal notice of the Motion for <u>Nunc Pro Tunc</u> approval of the refinance, IndyMac joined in the motion.  AA:48.  IndyMac also filed its own Motion for <u>Nunc Pro Tunc</u> approval of the refinance and for relief from stay to record a lien.  AA:46.  IndyMac claimed that it was not guilty of wrongdoing because its underwriter did not see a notation in the Preliminary Title Report that recorded Harbin's bankruptcy filing.  AA:46:1127:1-8 and footnote 2.  Without any factual support, IndyMac asserted that the refinance had benefited the estate by infusing cash into the estate.  AA:46:16-19.  IndyMac thought that its loan provided cash to pay the debtor's creditors.  AA:46:1127:20-21.  IndyMac does not provide any analysis of whether the payment to creditors would harm Sherman who is being prejudicially denied a pro rata share of the payments.  IndyMac contended in its motion that Southland Title informed IndyMac that Harbin would be quitclaiming his interest in the property to Mrs. Harbin and that the property would vest in Mrs. Harbin.  AA:46:1130:26-1131:13.  IndyMac contended that Mrs. Harbin violated the Loan Documents when she transferred the title back to John Harbin.  AA:46:1133:3-11.  IndyMac cited to <u>In Re American Cooler Co.</u>, (2nd Cir. 1942) 125 F.2d 496, 497 to establish the elements required to be established before a Motion for <u>Nunc Pro Tunc</u> approval of the loan

15

could be granted.  AA:46:1133:15-21.  Those elements are identical to the elements discussed by

the U.S. Trustee in preparation for the August 5, 2003 hearing, and are:

      1)      the post-petition incurrence of the debt would have been approved by

                the court if prior authorization were sought;

      2)      the creditors have not been harmed by the loan;

      3)      the parties honestly believed that they had the authority to enter into

                the transactions.  Id.

      The U.S. Trustee then entered into a stipulation with IndyMac in which the U.S. Trustee

agreed not to oppose the motion as long as the plan then being proposed by John Harbin was

confirmed.  AA:54 (Stipulation Between U.S. Trustee and IndyMac).  Sherman opposed the ex

parte application to approve that stipulation (AA:55) and opposed the Motion for Nunc Pro Tunc

approval, etc. filed by IndyMac.  AA:56.  Sherman pointed out that Angela Harbin had

previously admitted that the loan broker knew about her husband's bankruptcy and had

recommended the illegal quitclaim deed scheme described above.  AA:56:1372:14-17.  Sherman

further found it impossible to believe that two separate employees had failed to notice that

Harbin's bankruptcy was reported on the Preliminary Title Report.  AA:56:1372:18-21.

Sherman further pointed out that In Re Lehigh Valley Professional Sports Club, Inc., (BC ED

PA 2001) 260 B.R. 745 required the court to find 1) that a balancing of the equities supported

granting the motion and 2) that there would not be any prejudice to interested parties.

AA:56:1373:23-1374:3 (Opposition to IndyMac's motion for postpetition refinance).  Sherman

argued that mere neglect does not rise to the level of justifying the extraordinary relief of nunc

pro tunc approval.  AA:56:1375:2-3.  Sherman further pointed out that the moving party must

show why prior bankruptcy court approval was not obtained; IndyMac could not meet that element because Harbin could have sought permission in an emergency manner. AA:56:1375:8-14. Sherman also argued that IndyMac was not entitled to a lien under 11 U.S.C. §364 because the loan was not made for administrative expenses. AA:56:1375:22-1376:20. IndyMac similarly was not entitled to a replacement lien because it did not improve the value of the property, but actually encumbered the property more than it had previously been encumbered. AA:56:1377:7-19.

IndyMac replied by contending that it was innocent of wrongdoing. AA:64:1564-1566. The bank also contended that its loan benefited the estate. AA:64:1566:20-1567:23. IndyMac's argument was that the refinance loan provided a mechanism for Harbin to pay his creditors. AA:64:1567:25-1568:20. In its discussion of the "equities" IndyMac ignored how Mr. Sherman would be harmed by the court granting the motion for nunc pro tunc approval when IndyMac's claimed "negligence" was the reason it had issued an illegal loan. Sherman contends that an innocent non-negligent party to the refinance should not be punished while IndyMac and Harbin go unpunished for their intentional misconduct and admitted negligence. The equities do not favor granting nunc pro tunc relief at the expense of Sherman's right to seek collection of his debts from the equity in the property.

IndyMac further argued that its loan had improved the property by eliminating Washington Mutuals' prior lien and paying the property taxes. AA:64:1568:21-1570:18.

On December 11, 2003 the court granted the two Motions for Nunc Pro Tunc approval of the refinance while at the same time holding that Sherman's recourse would be to look to the equity in the property should he succeed in his state court appeal and have a judgment against

17
--

Harbin.  Transcript, December 11, 2003 at 21:12-22.  When Sherman pointed out that he was

prejudiced by having $53,896.05 taken from the equity he could seek to collect, the court held

that $53,896.05 was "de minimus."  Id. at 37:1-20.  Thus, the equity in the house, the sole asset

remaining for Sherman to be paid if he prevailed in his state court appeal, was substantially

diminished by the court's order.  AA:37:11-15.

### C. THE COURT CONFIRMED A CHAPTER 11 PLAN OVER JEFFREY SHERMAN'S OBJECTION THAT THE PLAN DID NOT PROVIDE FOR THE POSSIBILITY THAT SHERMAN WOULD PREVAIL IN HIS STATE COURT APPEAL.  THE FAILURE TO PROVIDE FOR SHERMAN'S POSSIBLE JUDGMENT IN THE STATE COURT LITIGATION RENDERED THE PLAN INFEASIBLE.

On August 2, 2002 the court held a hearing on the Chapter 7 Trustee's motion to

compromise its claim to Harbin's real estate and Harbin's motion to dismiss.  Sherman

announced that he intended to appeal the Los Angeles Superior Court's decision.  Transcript,

August 2, 2002 at 6:14-15.  The court denied the motion to compromise because it appeared that

others were willing to pay more than Harbin offered.  Id. at 10:9-14.  The court also ruled on

Harbin's Motion to Dismiss the Chapter 7 on that day.  The court recognized that the state

court's judgment at that time was not final.  Id. at 13:19-24.  Harbin's attorney argued that it

could take "a couple years to go through the appellate process for Mr. Sherman to attempt to

overturn that."  Id. at 14:1-2.  The court denied the Motion to Dismiss and responded **"The best

thing to have happen in this matter is for the state court to resolve the issue.**  But, the

interim, again, Mr. Harbin chose to file bankruptcy, so he's here."  Id. at 15:14-19.  [emphasis

added].  Harbin argued that by delaying or denying the Motion to Dismiss the other creditors

would be tied up by Sherman's claims.  Id. at 16:13-16.  He further argued:  "If the court denies

the dismissal motion, then all that's going to be here and all the rest of the unsecured creditors,

their rights are going to be delayed as result of these – this proof of claim that Mr. Sherman has

filed…" Id. at 17:1-5. Harbin also argued that the other creditor's rights "are going to be

adversely affected for months if not years while this case dwindles on." Id. at 18:5-7. The court

*rejected that argument* as follows:

> "THE COURT:  Not Necessarily.  The trustees have been known – and **the
> courts have approved interim distributions to creditors** when there's a lot of
> cash sitting around and that may very well be the case here.  In fact, it seems to
> me that's certainly a possibility."   Id. at 8-13.  [emphasis added].

Therefore, early in the case the court recognized that it could take years to resolve

Sherman's state court appeal and that interim distributions could be made to other creditors in

order to provide them with a pro rata share of the distribution while preserving Sherman's rights.

The court held a hearing on September 27, 2002 wherein it granted Sherman's motion for

relief from the automatic stay to allow the parties to resolve the state court litigation. See,

Transcript, September 27, 2002 at 8:10-10:19. The court noted that both sides "want this matter

resolved in state court," which would involve an appeal. Id. at 8:22-25. So, the court concluded,

"it will involve an appeal, we might as well…get at it and get the…litigation completed in this

court." Id. at 9:1-3. The court again repeated, "it makes sense to resolve that litigation in state

court." Id. at 10:12-13.

Next the court turned its attention to Sherman's above-described motion to convert the

case back to Chapter 7. Id. at 12:10. In discussing that motion the court recited some of the

procedural background of the bankruptcy proceeding. The court noted that Harbin filed a

motion to dismiss his case which was opposed by everyone involved, including the Chapter 7

Trustee. Id. at 12:4-19. Specifically, the Chapter 7 Trustee wanted to let the bar date run,

19

--

wanted to do some more investigation as to assets, and had a disagreement about Harbin's plan to pay some, but not all of the debtor's debts.  Id. at 12:16-19.  It is clear that the court forgot the key factors behind the Trustee's opposition to Harbin's Motion to Dismiss because the court later ruled on December 11, 2003 that Sherman's objections to Harbin's proposed Second Amended Plan fell on deaf ears because Sherman had been the party who prevented Harbin from dismissing his Chapter 7 case. See, Transcript, December 11, 2003 at 14:13-21.

Further, on September 27, 2002 the court opined that creditors such as Mercantile National Bank and Sherman & Sherman would not be paid until Sherman's state court action was resolved, "and that might take, what, a couple years?" Transcript, September 27, 2002 at 30:21-24.  The court held that it would be unfair to sell the house at that stage of the case and simply hold the money in an account waiting for Sherman's state court appeal to be resolved. Id. at 30:25-31:3.  The court recognized that **Sherman's claim was contingent**. Id. at 31:12-14 (the court was addressing its comments to Norman Kreisman, attorney for Mercantile National Bank, but appears to have momentarily been thinking of Sherman's claim).  The court denied Sherman's motion to convert the case back to Chapter 7. Id. at 39:1-5.

On December 20, 2002 Harbin filed a proposed Plan of Reorganization. AA:74:1694. Harbin's plan recognized that there were then $1,545,600 in disputed claims against the estate. Id. at 1699:18-19.  He proposed to pay the undisputed creditors a pro rata share of their claim compared to the balance of all pending unsecured claims. Id. at 1699:21-27.  The plan that Harbin proposed was to liquidate his assets in order to pay his debts.  Harbin stated that he intended to accomplish this liquidation by selling his interest in his most valuable asset, his Coronado home, to his wife. AA:74:1699:11-17; See also The Disclosure Statement at

AA:75:1729:11-17.  The plan proposed to pay between 27 percent and 87 percent of the

unsecured creditor's claims with "87 percent being the most that they would be paid if Ken

Sherman's claim and Sherman and Sherman's claim was valued at zero."  Transcript, January

29, 2003 at 18:6-10.

Harbin asserted that his interest in the Coronado property was $109,500.

AA:75:1734:20-23.  This sum was based upon the $1,025,000 sum that Angela Harbin sought to

pay in the Motion to Sell Harbin's interest in the real property to Angela Harbin that was

discussed previously.  Sherman objected to the plan mostly because it grossly undervalued

Harbin's residence.  AA:76:1757:13-28.  Sherman contended that once the property was valued

at a more reasonable price there would be $316,100.50 available to creditors under Harbin's self-

serving analysis.  AA:76:1758:11-23.  Sherman argued that the plan was not proposed in good

faith.  AA:76:1761:6-20.

At the hearing on the plan and disclosure statement on January 29, 2003, Sherman

contended that the case should be converted to Chapter 7 because this was the second plan

Harbin had proposed unsuccessfully and he was not protecting the interests of the creditors.

Transcript, January 29, 2003 at 11:19-24.  The court declined to convert the case noting that

Sherman had a disputed claim and that he was not inclined to "tighten the reins" on the time

limits in the case.  Id. at 13:5-9.  In other words, the court recognized yet again that the case

could not be fully administered until Sherman's state court appeal was finally adjudicated.

The court held a status conference on the Chapter 11 on March 5, 2003.  At that status

conference, the court again characterized this case as a two-party dispute that would likely have

to be resolved "probably in the California appellate court system."  Transcript, March 5, 2003 at

21

--

15:14-20. Harbin's counsel represented to the court that he would be filing a plan that would allow Harbin to hold the real property "pending resolution of the disputed claims." Id. at 6:19-24. Harbin's counsel also identified a fund being created out of which the "debtor would be willing to distribute those funds at confirmation to pay whatever the pro rata amount that would otherwise be paid to creditors based on the court's liquidation through the estimation process of the disputed claims." Id. at 8:2-13.

On May 8, 2003, in response to the court's inquiry about the status of the state court appeal, Sherman's counsel represented that the record was designated and he hoped to file a brief shortly. Transcript, May 8, 2003 at 13:10-20. The court then said:

> "Well, this court's thinking, frankly, is –is as long as the assets are protected in this estate, and since we appear to be dealing or involved in a two-party dispute, I'm going to give the debtor some reasonable amounts of time without having to sell the house. I think the record shows that this court is going to make sure that the creditors are going to get the best and highest value from the sale of this house…So, the court is mindful of your clients' concerns in this case. But, by the same token, I'm not going to—**I'm not going to push this case any harder.**" Id. at 13:21-14:8. [emphasis added].

Sherman's counsel stated:

> "As long as we're discussing some of the issues about treatment of the creditors, one concern that we have is along the lines of what the court said earlier about protecting our rights if we do reverse the court, the trial court's decision on appeal; and that is this plan is asking the court now to assume that our client's claim is zero, so when he gives this hundred percent analysis, he's not including our client's claim, and that's something I want to make sure--very clear on the record is not a sufficient plan because it does not sufficiently provide for the possibility—which we think is a likelihood—that we can reverse the trial court's decision." Id. at 20:23-21:12.

The court did not dispute Mr. Johnson's contention that the court had said it would be sure to protect Mr. Sherman's rights if he prevailed in his state court appeal, but instead said simply, "Okay, well, we'll deal with that at confirmation." Id. at 21:13-14. Harbin's attorney

contended that Sherman's claim had been disallowed by the state court's decision and by the

Bankruptcy Court disallowing the claim while recognizing the contingent and conditional nature

of Sherman's claims. Id. at 22:12-23. The court then indicated some changes it required in the

plan. See, Id. at 23:3-10.

On July 15, 2003 the court held a further hearing on the status of the Chapter 11, along

with other issues. Harbin's attorney represented that:

> "I think we all understood and have understood that there could be a range
> in value in this residence....
> But in the end what we had done in response to those concerns is propose
> a First Revised Plan of Reorganization where we hold that asset for the benefit of
> the creditors. And there's obviously been tension as to value throughout this
> case. And we have conceded that we will hold that asset for the benefit of the
> creditors." Transcript, July 15, 2003 at 15:24-16:9.

Harbin's attorney summarized the plan that Harbin would propose as including two

distributions. The first distribution would be to what he calls the "undisputed creditors" and the

other would be made after the disputed claims were resolved. Id. at 17:15-18:13. Therefore,

Sherman understood that a pro rata share of funds would be held until his claims were fully

resolved. See, Id. at 18:1-3 (Harbin's attorney proposes "holding an equal pro-rata distribution

for the disputed creditors, if allowed, or if unresolved until the end."). In context of the court's

prior comments that Sherman's claim would be resolved in the California Court of Appeal,

Sherman believed that Harbin had promised to propose a plan that would hold a pro rata share

for him until the California appellate courts resolved his appeal. The court called Mr. Sherman's

claim contingent. Id. at 26:10-13.

Also on July 15, 2003 the court held a hearing on Sherman's adversary complaint to

object to the discharge of Harbin's debts. Id. at 54. The court's tentative ruling was "to grant

23

--

the summary judgment motion, **conditionally,** on the grounds that the creditors don't have

standing to bring this adversary proceeding." Id. at 54:1-4. [emphasis added]  The court

reasoned that it had previously granted summary judgment on another portion of the adversary

proceeding.  The court explained that it had granted the prior motion for summary judgment

"even though there was an appeal pending.  I did this by virtue of the 9th Circuit case of En Ray

Cobe [sic In Re Cobe], C-O-B-E, 229 Bankruptcy Reporter 15." Id. at 54:16-18.  The court

reiterated that the motion was being granted conditionally. Id. at 54:24-55:5.  Harbin's attorney

attempted to point out that the prior ruling on the motion for summary judgment was now final

because it had not been appealed.  The court again held that its order was conditional. Id. at

55:23-56:2.

 Sherman's counsel had the following dialogue with the court:

> "Mr. Johnson: ... Obviously, the **Court of Appeals in California will decide if
> there's a debt or not.**
> **The Court: Right.**
> Mr. Johnson:  So I think that the court is probably correct in making a consistent
> ruling throughout the case.  And we can reinstate this adversary if we do win on
> the appeal.
> I think I can't argue with the court's order on this case.
> The Court:  All right.
> Well, again, **the rights are reserved**.
> Mr. Johnson:  And that's the key that we wanted in our opposition; that we have
> the same right if we can win on the appeal and have our right reserved in this
> court.
> The court:  Yep.  You will.
> That will be the court's order.  The judgment is granted, conditionally.  And it's a
> standing order." Id. at 57:2-19. [emphasis added].

 Therefore, Sherman believed that the issue of whether or not he had a debt would not be

finally resolved until such time as the California Court of Appeal or the California Supreme

Court issued its ruling on whether or not Harbin could be held personally liable for breach of the

contract as the jury had ruled in its verdict.  Clearly, the court's order made it clear that Sherman

was not forever barred from recovering on his claim and that he would in fact be able to collect

on his claim if he prevailed in his state court appeal.

Meanwhile, Harbin filed a formal objection to Sherman's claim.  The court sustained that

objection and included in its final order the following language:

> "Since this claim is based on a pre-petition state court judgment that is not yet
> final, if Creditors appeal the state court judgment and if the appellate court
> reverses or vacates the judgment in favor of Creditors, then Creditors will be
> allowed to seek relief from this Court to reinstate their claim." AA:39:804:7-11.

That is the same language the court had indicated it used in ruling on the motion for

summary judgment.  AA:39:803:17-27.  Therefore, it was understood that the court intended to

preserve all of Sherman's rights and that the court recognized that Sherman's claim was only

**conditionally** disallowed pending the resolution of the state court appeal.  In other words,

Sherman's claim could only be finally resolved by the California Court of Appeal, as the court

had assured Sherman in the July 15, 2003 hearing.

Sherman filed a motion to appoint a Chapter 11 trustee because he believed that Harbin

had defalcated on his fiduciary duties.  That matter came regularly for hearing on September 11,

2003.  In that hearing the court held that Sherman, whose claim had been conditionally

disallowed on August 6, 2003, had a "contingent disputed claim."  Transcript, September 11,

2003 at 4:8-10.

Harbin's counsel argued that Sherman did not have standing to bring the motion because

his claim had been disallowed.  The court disagreed and ruled that Sherman had standing.  Id. at

15:15-21. fn3  The court continued the hearing to the date of confirmation.  Id. at 26:21-24.

_____

3 While the transcript reads "continued disallowed claim" appellant contends that it is illogical

25

--

Harbin then filed a proposed Second Amended Plan, which was scheduled to be

confirmed on December 11, 2003. AA:51. Harbin's newly proposed Second Amended Plan did

not mention Sherman's potential claim and did not provide for two distributions as had been

discussed in previous hearings. AA:51:1163-1192; See also the Second Amended Disclosure

Statement found at AA:52. Sherman objected that he was not provided for in the plan in a

manner that would allow Sherman to be paid if he prevailed in his state court appeal.

AA:61:1465:2-22. Sherman pointed out that he had then filed his opening brief on appeal.

AA:61:1466:10-13 and 1484-1548. Sherman objected that Harbin's plan was unclear as to the

source of funds that would be loaned to him. AA:61:1466-24-27. Sherman objected to the

property vesting in Harbin upon confirmation. AA:61:1467:5-24. More specifically Sherman

contended that the plan violated 9th Circuit law because it did not provide for the possibility that

Sherman would prevail in his state court appeal. AA:61:1468:1-6. Sherman argued that if the

"undisputed creditors" could receive 100% of their claims, the failure to guarantee Sherman

100% of his claim if he prevailed in the state court rendered the plan infeasible. AA:61:1469:10-

19. Sherman cited to In Re Shoen, (1996 BC AZ) 193 BR 302, 311-312, which held that a claim

is defined to include any contingent or liquidated claim, no matter how remote. AA:61:1469:8-

9. This is relevant since the court had previously held that Sherman's claim was contingent upon

his success before the California Court of Appeal. Sherman further cited to In Re Dennis Ponte,

Inc., (9th Cir. 1986) 61 B.R. 296, 299 and In Re Pizza of Hawaii, supra, at, 1384 and argued that

each of those cases prevented the court from confirming a Chapter 11 plan that did not provide

for the possibility that Sherman would prevail in his state court litigation and have a judgment

to believe the court said it was a "continued disallowed claim." It is more likely the court said it
was a contingent or conditionally disallowed claim, as that would be consistent with the court's

26

--

against Harbin.  AA:61:1470:3-1471:19.  Sherman argued that the plan was fundamentally unfair because it did not make it possible for Sherman to get a pro rata share if he prevailed in his state court litigation because Harbin did not have sufficient assets to pay Sherman 100% of his claims.  Sherman repeated his objection that the court should not allow title to Harbin's real property to vest in him as such vesting would prevent Sherman from assuring that he receives adequate and equal treatment under the plan.  AA:61:1477:22-1478:1.

At the confirmation hearing, the court indicated on the record that Sherman was not affected by the terms of the plan because he was not discussed in the plan.  Transcript, December 11, 2003 at 21:12-22 ("There's no discharge issued against – of the claim that your clients filed.  There's no discharge.  The claim isn't discharged.  The claim exists.");  Transcript, December 11, 2003 at 30:22-31:8, where the U.S. Trustee argued that the Sherman claim should not be discharged as follows:

> "MS CARROLL:  I just want it to be clear that it's not been discharged and that the order should reflect that.
> THE COURT:  Yeah, Okay.  The order—might as well put that in the order.
> If the plan is silent.  Again, I recited that this claim is not being dealt with by this plan because there is no claim.
> MR. MORRELL:  Correct, your honor.
> I believe we should get the full benefit of whatever we get under the Code in 1141.
> THE COURT:  Yeah.  All right."

The court thus held in the course of the discussion above-recited that Sherman's claim was not discharged by this plan when the court agreed with Ms. Carroll, but then appears to agree that the debt should be discharged because it agreed with Mr. Morrell that the creditor should have all of the benefits of 11 U.S.C. §1141, which holds that any claim known at the time a bankruptcy petition is filed is discharged by a confirmed Chapter 11 plan.  It appears that the

prior comments.

27

--

court intended to rule that since Sherman was not provided for in the plan he was not affected by

the plan and his debt was not discharged.  It is thus confusing that the court later entered an order

over Sherman's objection that omitted language holding that the Second Amended Plan did not

discharge Sherman's claim.  AA:70:1645-1677.  Sherman attempted to point this problem out to

the court by objecting to the proposed order confirming the plan. AA:73:1689:1-21;

AA:73:1690:26-1691:10.

In overruling Sherman's objection to the proposed Second Amended Plan, the court

distinguished In Re Pizza of Hawaii, supra, reasoning that Sherman's claim had been disallowed

but that did not happen in the Pizza of Hawaii case. Transcript, December 11, 2003 at 23:21-

26:3.  The court ruled that its August 6, 2003 order disallowing Sherman's claim did not prevent

Harbin from having a plan confirmed, thus showing the court misunderstood that Sherman did

not object to an appropriate plan being confirmed, but instead objected to this particular plan

because it did not provide for the possibility Sherman would have a claim.  Id. at 26:1-3; See

also, Id. at 27:3-11.  Sherman argued that Pizza of Hawaii was actually analogous to the facts

here because the creditor in Pizza of Hawaii did not file a claim at all and by operation of law did

not have a claim, which is similar to the court saying that Sherman's claim was disallowed.

AA:26:22-27:2.  The court then attempted to distinguish Pizza of Hawaii by arguing that the

bankruptcy court there had issued an order that a plan would not be entertained until the civil

case had terminated.  AA:27:17-25.  Sherman contended that the court had made similar

assurances to Sherman.  AA:28:2-6.  Some of those previous comments are reflected in the

record and include the court's comments that the creditors would have to wait until Sherman's

appeal was finally resolved in the state court, the court's comment that it was only conditionally

granting summary judgment and only conditionally disallowing the claim, and other comments cited herein. The court then contradicted its previous rulings that Sherman's claim was contingent and now said the claim is not contingent despite the fact that Sherman could prevail in the California appellate courts and have a substantial judgment against Harbin. Transcript, December 11, 2003 at 15:9-11; AA:31:10-22. Sherman argued that his claim was contingent because it depended upon the result of his state court appeal. AA:32:12-23. The court also distinguished Dennis Ponte, supra, contending that the creditor in Dennis Ponte arose post-petition. Transcript, December 11, 2003 at 53:25-54:4.

The court contradicted its prior ruling on September 11, 2003 that Sherman had standing; now holding Sherman did not have standing because his claim had been disallowed. Id. at 15:13-15.

Confusingly, the court ruled that Sherman was trying to collaterally attack the state court's judgment and was improperly seeking a lien against Harbin's assets. Id. at 16:10-17:7.

Thus, the court confirmed the plan while holding that Sherman could look to the equity in Harbin's house if Sherman prevailed in his appeal, but also ordering that more than $53,000 of the equity was properly taken out of the equity and could be given to other creditors.

## SUMMARY OF ARGUMENT

### A. THE BANKRUPTCY COURT ERRED IN CONFIRMING HARBIN'S SECOND AMENDED CHAPTER 11 PLAN

The Bankruptcy Court committed reversible error when it confirmed Harbin's proposed Second Amended Plan. The Plan did not provide for the possibility that Sherman would prevail in his state court appeal and would ultimately have a judgment in excess of $556,000 against

Harbin.  Since the plan provided that it would pay unsecured creditors 100% of their claims, the

plan was infeasible because there was not enough equity in Harbin's residence to ensure that

Sherman would also receive 100% of his claim if the California appellate courts rule that

Sherman has a judgment against Harbin.

The court erred in distinguishing In Re Pizza of Hawaii because the court had repeatedly

assured Sherman that the court was preserving Sherman's rights, because the court had told other

creditors that they would likely have to wait until Sherman's appeal was resolved before being

paid, because the court had assured Sherman that his claim would not be finally resolved until

the California courts issued their final rulings, because the court had indicated previously that it

was not in a hurry to confirm a Chapter 11 plan as it recognized that Sherman's appeal was

ongoing, and because the court had only conditionally disallowed Sherman's claim.  The court

had previously acknowledged at three different hearings that Sherman's claim was contingent.

However, at the confirmation hearing the court acted as though Sherman's claim was not

contingent and had not been conditionally disallowed.  This contradicted everything the court

had done and said prior to the confirmation hearing.  Further, the court and the debtor had

previously discussed a plan that would make two distributions, one initial distribution of a pro

rata share of the undisputed portion to creditors, and a second distribution when Sherman's

claims were finally adjudicated in the California courts.

It was reversible error for the court to confirm a Chapter 11 plan that did not ensure that

the creditors would receive equal treatment under the plan.  The Bankruptcy Code's entire

purpose is to ensure an orderly, equal and fair distribution to creditors.  The court ignored that

essential purpose behind the code and instead held incorrectly that Sherman was attempting to

30

--

get a remedy in Bankruptcy that he would not have if Harbin were not in bankruptcy.  That

ruling is without legal support and turns the Bankruptcy Code on its head.

The <u>Pizza of Hawaii</u> and <u>Dennis Ponte</u> cases hold that a Chapter 11 plan must provide for

the possibility that a "creditor" whose claim will be litigated through ongoing litigation will

prevail in that litigation.  The court's order must be reversed because it fails to follow the

holdings of those 9th Circuit cases.

### B. THE BANKRUPTCY COURT ERRED WHEN IT GRANTED THE TWO MOTIONS FOR <u>NUNC PRO TUNC</u> APPROVAL OF THE REFINANCE

The bankruptcy court further erred when it granted the motion for <u>nunc pro tunc</u> approval

of refinancing.  John Harbin, an experienced bankruptcy lawyer, knew that he was violating the

law when he executed a quitclaim deed relinquishing his ownership of his property to his wife.

Neither he nor IndyMac bank could prevail on the required element that both the lender and the

debtor believed in good faith they could enter into the transaction.  Neither could they provide an

adequate explanation as to why they had not sought and obtained prior bankruptcy court

approval.  Harbin knew he could not proceed without the bankruptcy court's permission and did

so anyway.  The Preliminary Title Report gave IndyMac notice of the bankruptcy and its

negligence did not create an extraordinary circumstance.  Further, the refinance prejudiced

Sherman by removing over $54,000 in equity from the house when Sherman's supposed remedy

would be to look to the equity in the house for recovery.  The court erred in calling $54,000 "de

minimus."

### ARGUMENT

### A.   THE BANKRUPTCY COURT COMMITTED REVERSIBLE ERROR IN CONFIRMING THE CHAPTER 11 PLAN WHEN IT DID NOT

31

--

**PROVIDE FOR THE POSSIBLITY THAT SHERMAN WOULD
PREVAIL IN HIS STATE COURT LITIGATION AND DID NOT
PROVIDE SHERMAN WITH EQUAL TREATMENT WITH OTHER
CREDITORS IF HIS CLAIM WAS REINSTATED**

The issue of whether a plan is feasible is reviewed under the clearly erroneous standard.

In Re Pizza of Hawaii, supra, 761 F.2d at 1377.

The Bankruptcy Court below concluded rather simplistically that Sherman's claim had

been disallowed without acknowledging that each of its rulings preventing Sherman from

asserting his claim were always stated to be conditional and contingent.  The court's prior

rulings had consistently indicated that Sherman's claim was contingent and only conditionally

disallowed due to Sherman's appeal.  (Transcripts, September 27, 2002, July 15, 2003, and

September 11, 2003).  The court had to distinguish two 9th Circuit decisions that had ruled that it

is reversible error to confirm a plan that did not provide for a potential, conditional or contingent

claim.  In distinguishing those cases, the court committed reversible error.

In In re Dennis Ponte, Inc., supra, the Bankruptcy Appellate Panel for the Ninth Circuit

held that a party who had a potential claim pending resolution of litigation had standing to object

to confirmation of a Chapter 11 plan that did not provide for that potential creditor.  The Dennis

Ponte case cited In Re Amatex Court, (3rd. Cir. 1985) 755 F.2d 1034 with approval in holding

that the Bankruptcy Court erred in confirming a plan that did not provide for the possibility that

the claimant's litigation would be successful.  Id. at 299-300.  See also, In re Pizza of Hawaii.,

Inc., supra, at 1384 (holding that confirmation of a Chapter 11 plan that did not provide for the

possibility that a plaintiff in a lawsuit could recover a large judgment was reversible error).

The Dennis Ponte case involved facts that are actually quite similar to the facts in this

case.  In Dennis Ponte the debtor filed a Chapter 11 petition that appears to have been caused by

32

--

its dispute with Brutoco. <u>Dennis Ponte</u>, <u>supra</u>, at 297 (The debtor declared it "was forced into

filing the Chapter 11 petition when Brutoco refused to pay for services rendered."). The debtor

then filed a complaint for turnover of estate assets. <u>Id.</u> Brutoco filed a counterclaim. <u>Id.</u>

Brutoco also filed a counterclaim for Interpleader, Breach of Contract, Offset, Libel, Indemnity

and Declaratory Relief. Only its counterclaim for libel was identified as arising out of post-

petition conduct of the debtor. <u>Id.</u> The debtor then filed a First Amended Plan of

Reorganization that held that the disputed, contingent or unliquidated claims will receive

nothing. <u>Id.</u> Brutoco objected to the plan, contending the plan did not mention that Brutoco's

claim, if ultimately allowed, would be an administrative expense that would make the plan

infeasible. <u>Id.</u> 297-298. The bankruptcy court confirmed the plan and held it was feasible. <u>Id.</u>

at 298. The bankruptcy court reasoned that until Brutoco had something "concrete, you're not

an administrative claim. It hasn't happened yet." <u>Id.</u> at 298. The debtor argued that if Brutoco

were ultimately successful in its counterclaim it could file a motion under 11 U.S.C. §503 for

administrative expense. <u>Id.</u> at 298. The Bankruptcy Appellate Panel ultimately rejected the

debtor's claim that Brutoco was protected by the fact that it could later assert its right to a claim.

<u>Id.</u> at 299. The court reasoned that a bankruptcy court's determination that a plan was feasible

without estimating the value of the future claim was clearly erroneous. <u>Id.</u> at 299-300. The

court further reasoned that "Brutoco likewise has the kind of **potential claim** that warrants

consideration as part of the confirmation process." <u>Id.</u> at 299. [emphasis added].

     Similarly, here, Sherman and Harbin were involved in what the court considered a two-

party dispute that would not be resolved until the California appellate courts ruled on Sherman's

appeal. Harbin argued that Sherman would be protected because he could seek to reinstate his

33

claim in the future.  The court had repeatedly referred to Sherman's claim as contingent (until he

suddenly reversed himself on the day of confirmation).  A contingent claim is by definition a

"potential claim."  Therefore, Sherman's potential claim warranted consideration as part of the

confirmation process.  The court, therefore, committed reversible error when it concluded that

Sherman's claim was conclusively disallowed and did not warrant consideration in the

confirmation process because the claim could not be estimated.  It should be noted that the court

did not have to estimate the claim, it could have simply required Harbin to make the two

distributions that Harbin had previously committed to making.  However, if the court were

required to estimate the claim, it could have estimated the claim to be the value of the verdict

plus post-verdict attorney's fees and costs.  If the court was unwilling to withhold a pro rata

distribution for Sherman, it was then required to hold an evidentiary hearing to estimate

Sherman's claim.  Of course, since the parties have now fully briefed the issues for the

California Court of Appeal, that court will likely rule within the next four to five months.

Therefore, the following language from Dennis Ponte applies here as well:

> "Whether or not future claimants have claims in the technical bankruptcy
> sense that can be affected by a reorganization plan, such individuals clearly
> have a practical stake in the outcome of the proceedings." Dennis Ponte,
> supra at 299.

The Dennis Ponte case also relied on Pizza of Hawaii, supra.  In Pizza of Hawaii, the

creditor, Shakey's, filed a lawsuit against various individuals who had entered into dealer

agreements with Shakey's.  Those individuals executed an instrument purporting to assign their

interests in the dealer agreements to the debtor.  The debtor then filed a Chapter 11 petition the

next day.  Id. at 1375.  Shakey's filed a motion for relief from stay so it could join Pizza of

34

--

Hawaii into the case.  The court denied that motion but stated that it would not entertain any plans of reorganization until the civil lawsuit was concluded.  Id. at 1375.  Shakey's amended its complaint and Pizza of Hawaii successfully intervened in the case.  Id.  Pizza of Hawaii then filed a First Amended Disclosure Statement and a First Amended Plan, which the court approved "effectively vacating" its prior order that it would not entertain a plan of reorganization.  Id. at 1376.  Shakey's appealed the confirmation order arguing that the plan was not feasible because it did not make provision for the enormous debt that Pizza would owe if Shakey's prevailed in the civil litigation.  Id.  The debtor argued that Shakey's did not have standing to object because it had not filed a formal proof of claim.  Id.  The District Court on appeal ruled that the lawsuit served as an informal proof of claim and gave Shakey's standing.  Id.  The district court ordered the bankruptcy court to estimate Shakey's claim.  Id. at 1377.  The district court had considered the pleadings filed in the civil action and Shakey's active participation in the bankruptcy proceedings in holding that Shakey's had an informal claim.  Id. at 1380.  The court reasoned that documents filed in the bankruptcy court evidenced Shakey's intent to hold Pizza liable.  Id. at 1381.

In holding that the bankruptcy court had improperly confirmed the Pizza of Hawaii Chapter 11 plan, the court reasoned that "[t]he district court reasoned that 'without the benefit of an estimate of Shakey's claim, the bankruptcy court could not have adequately judged the plan's feasibility…We agree with the district court that the bankruptcy court's finding of feasibility was clearly erroneous because the plan failed to provide for the possibility that Shakey's would recover a large judgment in the civil case."  Id. at 1382.  Interestingly, the debtor proposed a plan with cash requirements of $291,295.99 to be paid at plan confirmation.  Shakey's asserted a

35

--

claim of $58,335.23, only over one-fourth of the plan's estimated cash disbursements, yet the plan was still infeasible without an estimation of Shakey's claim. Id. at 1382.

Similarly, Sherman had asserted Harbin's liability to him and his intention to hold Harbin liable. Sherman participated actively in the bankruptcy and filed numerous documents evidencing his intent to hold Harbin liable, including the lodging of his opening brief on appeal before the California Court of Appeal. Sherman was actively litigating that claim to conclusion in the California court system. The court had granted relief from stay and stated that the California court system would ultimately decide if Sherman had a claim. Therefore, it was clearly erroneous for the court to find the plan feasible and to confirm a plan that did not provide for the possibility that Sherman would prevail in his state court appeal.

The Bankruptcy Court felt justified in confirming a plan that did not provide protection for the possibility that Sherman could prevail in his state court appeal because it had not promised not to confirm a plan while Sherman's appeal was pending. That was not one of the key facts in deciding the Pizza of Hawaii case. In fact, the key to the case was that Shakey's was involved in ongoing litigation in which Pizza of Hawaii was a defendant and the court concluded that the court could not confirm a Chapter 11 plan without providing for the possibility that the creditor would prevail in that litigation.

The bankruptcy court here had repeatedly indicated that there was no hurry to confirm a Chapter 11 plan because Sherman's appeal was pending, that its orders holding that Sherman was not owed a debt were conditional, and that Sherman's claim was contingent. Sherman simply contended that a pro rata share of the funds to be distributed should be withheld until Sherman's state court appeal was finally resolved. This is exactly what the court and Harbin had

36

--

APPELLANT'S OPENING BRIEF

indicated that they would do. Therefore, the court was incorrect in distinguishing the <u>Pizza of Hawaii</u> case because the court had effectively promised throughout the case that it would protect Sherman's rights, and that Sherman's claim would not be finally and fully disallowed unless the Court of Appeal ruled against Sherman. Therefore, the Bankruptcy Court's assurances to Sherman were similar to the <u>Pizza of Hawaii</u> court's assurances to Shakey's. Even if the court had not given any assurances to Sherman it erred in confirming the Second Amended Plan after it learned Sherman had appealed the Los Angeles Superior Court's judgment. Further, the fact that Sherman's claim was conditionally disallowed did not distinguish it from the facts of <u>Pizza of Hawaii</u>. The court had itself recognized on numerous occasions that its order was conditional and that the California appellate courts would make the ultimate decision of whether Sherman had a claim.

The key to both the <u>Dennis Ponte</u> and <u>Pizza of Hawaii</u> cases was that the party-in-interest was in the process of litigating to conclusion a lawsuit that would result in that party-in-interest having a claim if that party prevailed in the litigation. Sherman's claim arose pre-petition and was known at the time Harbin filed his bankruptcy. The court recognized initially that Sherman's claim was contingent. If Sherman prevails in his state court appeals he will have a large judgment, but the plan will not have provided for a method in which Sherman will be able to recover an equal distribution with the other creditors. In other words, Sherman will not recover 100% of his claims, but the other creditors will. That makes the plan infeasible and it can not be confirmed.

One of the fundamental policies of bankruptcy law, which is to ensure the orderly and fair distribution of assets. <u>In re Universal Life Church</u>, (ED CA 1991) 127 B.R. 453. The

37

Second Amended Plan confirmed by the court would allow the "undisputed" or "resolved" or "existing" claims to be paid 100% of $112,000 but fails to provide for Sherman to also receive 100% of his $556,000 plus claim if he prevails in his state court appeal. Therefore, Sherman is not afforded under that plan the right to have an equal and orderly distribution of the estate. This makes the plan infeasible under <u>Dennis Ponte</u> and <u>In Re Pizza of Hawaii</u>. Instead, the court incorrectly ruled that Sherman was attempting to "attach" Harbin's assets in order to preserve those assets if Sherman prevailed in his state court appeal. Given the clear purpose behind the bankruptcy code to provide for the equal distribution of estate assets to creditors, the court's reasoning is legally incorrect. Further, Sherman is not aware of any case or authority for the proposition that a debtor should be entitled to act as though he were not in bankruptcy. In essence, the Bankruptcy Court ruled that Sherman should not be entitled to his creditors rights because Sherman would not be entitled to those rights if Harbin were not in bankruptcy. Thus, the court also ordered the converse that Harbin should not be bound by the Bankruptcy Code because if he were not in Bankruptcy he would not be bound by the Bankruptcy Code. The court's reasoning is flawed. It is irrelevant what rights Sherman and Harbin would have if Harbin were not in bankruptcy. The relevant fact is that Harbin was in bankruptcy. Further, the Bankruptcy Court apparently forgot that it had sustained the Chapter 7 Trustee's opposition to Harbin's dismissal motion and ignored that Harbin had not renewed the motion.

> "Courts have denied confirmation of Chapter 11 plans that proposed widely disparate treatment of similarly situated creditors as unfairly discriminatory. See, <u>Oxford Life Ins. Co. v. Tucson Self-Storage (In re Tucson Self-Storage)</u>, (9th Cir. BAP 1994) 166 B.R. 892, 898.

In fact, it is reversible error for a bankruptcy court to confirm a Chapter 11 plan that provides disparate treatment to one class of creditors. <u>Id.</u> at 898. In this case, one set of

38

--

unsecured creditors will receive 100% of their claims, but Sherman would be entitled to decidedly less than 100% of his claims if he prevailed in his state court appeal.  This is similar to the <u>Oxford Life Ins. Co.</u> case and requires reversal of Judge Hargrove's confirmation order.

Moreover, the court not only denied Sherman the possibility of participating in the distribution to creditors, but the court also refused to sign Sherman's proposed version of the order which would have specifically set forth that the debt owed to Sherman is not discharged. The court did this despite its assurance on the record that Sherman's debt would not be discharged because the plan did not "affect" him and that such a provision should be included in the order.  The court thus prevented Sherman from receiving an equal pro rata distribution under the plan, but ordered that Sherman's debt was discharged.  See, 11 U.S.C. §1141 (confirmation discharges any debt tha6t arose pre-petition).  The court thought that Sherman's sole remedy would be the toothless and ineffective right to set aside the Order Confirming the Plan under Federal Rule of Bankruptcy 9024.  That would deprive Sherman of a remedy at all because he would not be able to recover the money paid to other creditors and would not be able to obtain equal pro rata distribution with them, thus defeating Sherman's rights under the Bankruptcy Code to an equal distribution.

The bankruptcy court erred in holding that Sherman did not actually have standing to object to the proposed Second Amended Chapter 11 Plan.  In <u>In Re Shoen</u>, <u>supra</u>, the court held that any party that could be affected by the Chapter 11 plan, no matter how remote or contingent that possibility, had standing to object.  <u>Shoen</u>, <u>supra</u>, at 311-312.  The court in that case found that a co-judgment debtor who had settled with the judgment creditor had standing to object to a Chapter 11 plan because of the remote possibility that the Chapter 11 debtors could seek

reimbursements from him for a joint and several judgment. Id. The reasoning in that case is persuasive here because Sherman is more likely to prevail in his state court appeal than that co-debtor was likely to be sued for reimbursement.

Harbin may contend that In Re Rath Packing Company, (BC ND IA 1985) 55 B.R. 528 supports the Bankruptcy Judge's apparent ruling that Sherman did not have standing to object because his claim had been conditionally disallowed. In Rath Packing Company the court held that the IRS's untimely proof of claim required the court to disallow the IRS's claim and that the IRS could not object to a Chapter 11 plan because its claim had been disallowed. Id. at 534-535. The case is distinguishable because a creditor whose claim is disallowed as untimely cannot later reinstate the claim. In other words, the order disallowing the claim was not conditional, nor did the court repeatedly inform the IRS that its rights were being protected because it still had a contingent claim. Similarly, debtor may rely on In Re Abijoe Realty Corp., (1st Cir. 1991) 943 F.2d 121. That case does not hold that a creditor whose claim has been disallowed cannot object. Instead, it simply cites to Rath Packing as a case that so held. The case is distinguishable for the same reasons that Rath Packing is distinguishable. Finally, Harbin may cite to In Re Kreisler Group, (2nd Cir. 1981) 648 F.2d 86 for the proposition that Harbin was not required to make a deposit to pay for Sherman's claim because Sherman's claim was disallowed. In Kreisler the court held that a creditor's claim that had been conclusively disallowed claim need not be provided for in the plan. The case is distinguishable because Sherman's claim was only conditionally disallowed so that the California Court of Appeal could ultimately resolve whether or not Sherman had a claim. See, Transcript, August 2, 2002 at 15:14-19;   Transcript, March 5, 2003 at 15:14-20.

**B.    THE COURT ERRED IN GRANTING THE MOTIONS FOR <u>NUNC PRO TUNC</u> APPROVAL BECAUSE THE ORDER PREJUDICED SHERMAN**

"A bankruptcy court's entry of a *nunc pro tunc* approval is reviewed for abuse of discretion or erroneous application of the law." In Re Atkins,  (9th Cir. 1995) 69 F.3d 970, 973. The bankruptcy court abused its discretion in holding that $54,000 was "de minimus" and could be taken from the equity in the house when that equity would be the asset Sherman could turn to in order to collect his judgment.

In <u>In Re Lehigh Valley Professional Sports Club, Inc.</u>, (BC ED PA 2001), 260 B.R. 745 the court held that something must be compelling in the equities and there must be an absence of prejudice to interested parties before a motion for <u>nunc pro tunc</u> approval can be granted.  <u>Id.</u>

The court denied a <u>nunc pro</u> tunc financing motion because the lender could have sought prior approval.  <u>Id.</u> at 752-753.  In this case, the equities do not warrant punishing Sherman by removing more than $53,896 from his potential recovery and giving that money to third parties. The court could have issued a replacement lien for the amount of the initial mortgage and ordered IndyMac to seek recovery of its $53,896 from Mrs. Harbin due to her bank fraud.  The court could have and should have punished Harbin for his fraudulent acts.  Instead, the court awarded Harbin and IndyMac at the expense of Sherman. The equities do not warrant such a result.  Sherman was prejudiced when the court refused to rule that a plan had to provide for the possibility that Sherman would prevail in his state court litigation and then deprived Sherman of the $53,896 that was available to pay creditors.

In this case, IndyMac cannot meet even the elements required by <u>American Cooler</u>, <u>supra</u>, for even if the court were to believe the remarkable and suspicious claim that IndyMac did

41

--

not know about Harbin's bankruptcy when it funded the loan, Harbin admitted that he knew at the time he signed the quitclaim to transfer his interest in the property to his wife that he was violating Bankruptcy law.  Further, its failure to adequately investigate whether it could fund the loan prevented nunc pro tunc approval.

The American Cooler case required that both the lender and the buyer honestly believed that they could make the loan.  In this case, Harbin knew that the loan could not be made. Therefore, the third element of American Cooler cannot be met.

Additionally, IndyMac's report of how this loan transaction occurred in the first place appears to contradict the loan records that Harbin finally produced in support of his motion for nunc pro tunc approval of the same loan.  The records make it clear that IndyMac's loan broker insisted that Harbin remove himself from title to the property.  IndyMac had a copy of the Preliminary Title Report and its own negligence is the only explanation it can provide for why it did not have notice of Harbin's bankruptcy.

In Bank of W. Mass. v. CPF Premium Funding (In re National Reserve Corporation), (BC D MA 1996), 199 B.R. 241, 246 the court denied a creditor's motion for nunc pro tunc approval of a post-petition security agreement because the creditor did not take adequate steps to ensure that the debtor could enter into the loan agreement.  To hold otherwise, the court reasoned, would encourage lenders and debtors to make their own agreements without first obtaining bankruptcy court approval.  Since IndyMac admits in its motion that it did not review the title report to see if one of the Harbin's had filed bankruptcy, the court must deny the motion under the CPF Premium Funding case.  See, AA:46:1129:25-1130:9.

Further, IndyMac and Harbin failed to establish that exceptional circumstances exist as to

42

--

warrant <u>nunc pro tunc</u> approval of the post-petition financing.  Mere neglect in reviewing the title report does not rise to the level of being an extraordinary circumstance that would justify <u>nunc pro tunc</u> approval.  See e.g. <u>Farinash v. Vergos (In re Aultman Enters.)</u>, (2001) 264 B.R. 485, 493-494.

In <u>In Re Atkins</u>, <u>supra</u>, also held that a party seeking <u>nunc pro tunc</u> approval must provide a satisfactory explanation as to why they did not first obtain approval from the court and must show that their actions benefited the estate.  Harbin could have sought approval between February 14, 2003, the date he signed the quitclaim deed (AA:40:1058), and February 25, 2003, but strategically elected not to.  Further, he did not benefit the estate, but himself, individually, by lowering his monthly mortgage payment.

The case of <u>In Re Blessing Industries, Inc.</u>, (BC ND IA 2001) 263 B.R. 268 mandates reversal of the order granting <u>nunc pro tunc</u> approval of refinancing because the debtor could have, and should have, filed a motion for approval of the transaction prior to the loan taking place.  Here, Harbin could have and should have sought emergency approval and failed to do so.

Additionally, the court is unlikely to have approved a refinance that took equity out of the property after the court had been so diligent in protecting that equity for the creditors, including Sherman.  There was no pressing need for the refinance to be completed.  The court had indicated on numerous occasions that it saw no need to alter the status of Harbin's interest in the real property until Sherman's appeal was resolved.  Therefore, Harbin and IndyMac failed to establish the required element that the court would have granted their motions if they were brought before the refinance was completed.  See, <u>American Cooler</u> at 497.

43

--

Given the factual background,  Harbin's intentional misconduct, IndyMac's negligence, and the prejudice to Sherman, the court abused its discretion in granting the motion.


## CONCLUSION

For the foregoing reasons, the court should issue its order reversing the Bankruptcy Court's order approving the Second Amended Disclosure Statement and confirming the Second Amended Plan.  The court should instruct the Bankruptcy Court that it can only confirm a plan that provides adequately for the possibility that Jeffery Sherman will prevail in his state court appeal.  The court must further reverse the order of the United States Bankruptcy Court granting the two motions for nunc pro tunc approval of the post-petition refinance as that order is prejudicial to Jeffery Sherman's rights.

Dated: June 2, 2004

Respectfully submitted
Lon B. Isaacson Associates
An Affiliation Including a
Professional Law Corporation

By:   _____
Larry Johnson
For the firm
Attorneys for Appellant  Jeffrey A. Sherman

44

--

**BRIEF FORMAT CERTIFICATION PURSUANT TO RULE 32(A)(7) OF THE FEDERAL RULES OF APPELLATE PROCEDURE**

Pursuant to FRAP Rule 32(a)(7)(C), I certify that Appellant's Opening Brief is proportionately spaced, using Times New Roman, 12 point type and that the word count as calculated by the word processing program (Microsoft Word 2000) used to prepare this brief is 13,771, not counting this certification, but counting the footnotes.

Dated: June 2, 2004

Respectfully submitted
Lon B. Isaacson Associates
An Affiliation Including a
Professional Law Corporation

By: _____
Larry Johnson
For the firm
Attorneys for Appellant Jeffrey A. Sherman

45
--

PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             )
COUNTY OF LOS ANGELES        )


        I am employed in the county of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 3435 Wilshire Boulevard, Suite 2910, Los Angeles, California 90010.

On June 2, 2004, I served the foregoing document described as:

APPELLANT'S OPENING BRIEF

        on ALL INTERESTED PARTIES in this action by placing a true copy thereof enclosed in a sealed envelope addressed as follows:

## SEE ATTACHED SERVICE LIST

        __xxx_ **(BY MAIL)** I caused such envelope with postage thereon fully prepaid to be

placed in the United States mail at Los Angeles, California.

        _____ **(BY PERSONAL SERVICE)**  I caused such envelope to be delivered by hand to

the offices of the addressee.

        _____ **(STATE)** I declare under penalty of perjury under the laws of the State of

California that the above is true and correct.

        xxx **(FEDERAL)** I declare that I am employed in the office of a member of the bar of

this court at whose direction the service was made.

        I declare under penalty of perjury that the foregoing is true and correct.

        Executed on June 2, 2004 at Los Angeles, California.

                                Peggy Lugo

_____

# SERVICE LIST

John L. Morrell
Paul J. Leeds
Higgs, Fletcher & Mack, LLP
401 West "A" Street, Suite 2600
San Diego, CA 92101

U.S. Trustee:
402 West Broadway
Suite 600
San Diego, CA 92101

Kelley Brinkman
Allen Matkins Leck Gamle
501 West Broadway, 9th Floor
San Diego, CA 92101

Clerk,
United States Bankruptcy Court
Southern District of California
Honorable John Hargrove
325 W. "F" Street
San Diego, CA 92101

2

PROOF OF SERVICE